Opinion issued September 4, 2008









Opinion issued September 4,
2008

 

 

 

 

 

 

 








 

     

 

 

 

 

 

In The

Court of Appeals

For The

First District of Texas

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



NO. 01-04-00903-CR

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



DAN RANDALL LEACH, II, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 

 



On Appeal from the 268th District Court

Fort Bend County, Texas

Trial Court Cause No. 39739








 

 



MEMORANDUM OPINION

Appellant, Dan Randall Leach, II,
pleaded guilty to murder.  The jury assessed punishment at seventy-five years’
confinement and a $10,000 fine.  Leach contends that the court erred in (1)
denying his motion to suppress his confession; (2) denying his motion to
suppress his statements made to clergy members; (3) denying his motion for
change of venue; and (4) denying his challenges for cause during voir dire.  We
affirm.

Background

          In his videotaped statement to Fort
Bend County Sherriff’s deputies, Leach stated that he and the complainant,
Ashley Wilson, had dated when they were in high school but the relationship
ended when she suffered head injuries in an accident.  After high school, Leach
entered the air force.  When he returned to Texas a few years later, Leach and Wilson reconnected.  In late January 2004, Wilson became pregnant with Leach’s child, and when
she told him, he began thinking of ways to “deal with it.”  No one was aware of
Leach and Wilson’s relationship or that Leach was the father of Wilson’s child.

          Three days after he learned
of Wilson’s pregnancy, Leach sneaked out of his parents’ home around 11:00 pm
and went to Wilson’s apartment.  According to Leach, Wilson was depressed and
insecure about the future.  Leach convinced Wilson to engage in
“pseudo-therapy” with him, in which she would write down all the negative
things in her life after which he would show her all the good things.  Leach
told Wilson not to include any mention of him.  Leach then placed the note at
the foot of Wilson’s bed so that it would be found.

          After Wilson wrote the note, Leach convinced Wilson to put a pillowcase over her head as part of a
trust exercise.  While her head was covered, Leach grabbed a three-foot long
cord with which he intended to strangle her.  He then asked Wilson to put her arms under his legs, which made Wilson nervous and agitated.  Leach then
“executed his plan” and strangled Wilson with the cord.  Leach stated that he
wrapped his legs loosely around her so that he would not leave any impressions
on her body.  He strangled her for ten minutes to make sure that she was dead. 
Leach then positioned her body on the bed to that it would appear that she had
tied herself to the bed rails in an attempted or experimental suicide.  Leach
wiped his fingerprints off everything he might have touched, took Wilson’s front-door key, and left her apartment, locking the door behind him.

          Sheriff’s deputies
initially believed that Wilson had committed suicide and closed the case. 
After seeing the film “The Passion of Christ,” Leach felt he had been “pricked
by God” and needed to face the consequences of killing Wilson.  On March 7,
2004, Leach stood before the congregation at his church and stated that he was
going on a long journey.  When he returned home from church, he confessed to
his parents.  His father then called the church elders to the house, and Leach
confessed to them as well.  The church elders encouraged Leach to turn himself
in to the authorities.  Leach, his parents, and the church elders then went to
the Fort Bend Sheriff’s Office, where Leach told the deputies that he wished to
make a statement concerning the death of Wilson.  After the deputies read Leach
his Miranda[1] warnings, Leach decided
he wanted to hire a lawyer and left the station.

          Two days later, Leach
returned to the sheriff’s office and made a videotaped confession in which he
described killing Wilson.  Two weeks after making his confession, Leach was
arrested for Wilson’s murder.

Motions to Suppress

          In his first two issues,
Leach contends that the trial court erred in denying his motions to suppress
(1) his videotaped statement to the sheriff’s deputies and (2) the statements
that he made to his church elders.  Leach first asserts that his confession was
involuntary because the police officers obtained his statement in violation of
his right to counsel.  Leach also contends that the statements that he made to
his church elders were protected under Texas Rule of Evidence 505 because he
spoke confidentially with the elders in exchange for spiritual guidance.




Standard of Review

We apply a bifurcated standard of
review to motions to suppress, giving almost total deference to the trial
court’s determination of historical facts, while reviewing de novo the court’s
application of the law.  Maxwell v. State, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002).  We defer to the trial court’s rulings on “mixed questions of law and
fact if the ultimate resolution of those questions turns on an evaluation of
credibility and demeanor.”  Loserth v. State, 963 S.W.2d 770, 772 (Tex.
Crim. App. 1998).  “In a motion to suppress hearing, the trial court is the
sole trier of fact and judge of the credibility of the witnesses and the weight
to be given to their testimony.”  State v. Ross, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000); Foster v. State, 101 S.W.3d 490, 495 (Tex. App.—Houston [1st Dist.] 2002, no pet.).  Accordingly, the trial court may believe or disbelieve all
or any part of a witness’s testimony, even if that testimony is not
controverted.  Ross, 32 S.W.3d at 855.  When the trial court files
findings of fact with its ruling on a motion to suppress, we do not engage in our
own factual review, but determine only whether the record supports the trial
court’s fact findings and address only the question of whether the trial court
properly applied the law to the facts.  Romero v. State, 800 S.W.2d 539,
543 (Tex. Crim. App. 1990).  “If the ruling was
correct on any theory of law applicable to the case, in light of what was
before the trial court at the time the ruling was made, then we must uphold the
judgment.” Sauceda v. State, 129 S.W.3d 116, 120 (Tex. Crim. App. 2004).  

Motion to Suppress Videotaped Statement

As first explained in Miranda v.
Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966), an accused has a
Fifth and Fourteenth Amendment right to have counsel present during a custodial
interrogation.  Edwards v. Arizona, 451 U.S. 477, 482, 101 S. Ct. 1880, 1883 (1981). Unlike the right to counsel under the Sixth Amendment, which attaches
automatically, the Fifth Amendment right to counsel will attach only when
affirmatively invoked by the accused. See Miranda, 384 U.S. at 473–74, 86 S. Ct. at 1627–28. Such “[a]n invocation must be clear and unambiguous; the
mere mention of the word ‘attorney’ or ‘lawyer’ without more, does not
automatically invoke the right to counsel.”  Dinkins v. State, 894
S.W.2d 330, 351 (Tex. Crim. App. 1995).  Rather, the right to counsel is
considered invoked when the accused indicates that he wants to speak to an
attorney or have an attorney present during questioning. Lucas v. State,
791 S.W.2d 35, 45 (Tex. Crim. App. 1989).

Generally, when a person accused of a
crime requests counsel, interrogation of that person must cease until he has
obtained a lawyer to assist him.  See Muñiz v. State, 851 S.W.2d 238,
252 (Tex. Crim. App. 1993).  However, when the person subsequently reinitiates
communication with the police and validly waives his right to counsel, then the original
election is countermanded and police interrogation may resume.  Cross v.
State, 144 S.W.3d 521, 529 (Tex. Crim. App. 2004). 
Under a two-step procedure to determine whether a suspect has waived his
previously invoked right to counsel, “[t]he first step requires proof that the suspect
himself initiate[d] further communication with authorities after invoking [his]
right to counsel.  The second step requires proof that, after he reinitiates
communication with the authorities, the suspect validly waives the right to
counsel.  Once the two-step waiver requirement is shown, the suspect has
countermanded his original election to speak to authorities only with
assistance of counsel [and] [t]he Edwards rule is fully satisfied.”  Id. at 527 (citing Oregon v. Bradshaw, 462 U.S. 1039, 1044–46, 103 S. Ct. 2830, 2834–35 (1983)).

Analysis

The trial court entered extensive
findings of fact and conclusions of law to support its ruling denying Leach’s
motion to suppress.  See Cullen v. State, 195 S.W.3d 696, 698 (Tex. Crim. App. 2006) (requiring that a trial court state findings of fact and conclusions of
law concerning the voluntariness and admissibility of a defendant’s
statement).  The evidence in the record supports the trial court’s findings.

On March 7, 2004, Leach arrived at
the sheriff’s office on his own initiative to make a statement regarding Wilson’s murder.  At that time, the sheriff’s office was not investigating Wilson’s death.  After Leach informed them that he wanted to discuss Wilson’s death, the
deputies read Leach his Miranda warnings.  See Miranda, 384 U.S. at 473–74, 86 S. Ct. at 1627–28; Tex. Code Crim.
Proc. Ann. art. 38.22 (Vernon 2005).  Leach indicated that he did not
want to give a statement without a lawyer present.  The deputies informed Leach
that an attorney could not be appointed for him until he provided enough
information to reopen the case which would lead to his indictment and arrest,
at which time the court would determine if he were indigent.  Leach then told
the deputies that he would call them when he decided what he wanted to do, and
he left the sheriff’s office with his family.  Leach testified that he and his
family looked for an attorney but were unable to find one whom they could
afford.

There are “four general situations [that]
may constitute custody: 1) when the suspect is physically deprived of his
freedom in any significant way; 2) when a law enforcement officer tells a
suspect he cannot leave; 3) when law enforcement officers create a situation
that would lead a reasonable person to believe that his freedom of movement has
been significantly restricted; and 4) when there is probable cause [for] arrest
and law enforcement officers do not tell the suspect that he is free to leave.” 
Dowthitt v. State, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996); see also California v. Beheler, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 3520 (1983) (explaining that “the
ultimate inquiry is simply whether there is ‘formal arrest or restraint on
freedom of movement’ of the degree associated with a formal arrest”).  None of
these situations applied when Leach first went to the sheriff’s office: 
Leach’s freedom of movement was not restricted in any way, he was allowed to
leave when he chose, and the officers did not have probable cause for an
arrest.  Because Leach was not in custody at that time, he was not
entitled to Miranda protection, and thus, the deputies were not required
to provide Leach counsel.

Leach voluntarily returned to the
sheriff’s office two days later, after his minister called him and suggested he
talk with the detectives again.  When Leach arrived, Detective Kubricht took
him into an interview room and began videotaping the interview, at the
beginning of which Kubricht re-read Leach his Miranda warnings. 
Specifically, Detective Kubricht advised: “[Y]ou have the right to remain
silent and not make any statement at all and any statement that you make may be
used as evidence against you at your trial.  Any statement may be used as
evidence against you in court.  You have the right to have a lawyer present to
advise you prior to and during any questioning.  If you’re unable to employ a
lawyer you have a right to have a lawyer appointed to advise you prior to and
during any questioning, and you have the right to terminate this interview at
any time.”  Leach stated that he did not have any questions about his rights
and signed a card stating that he received the warning and that he chose to
voluntarily waive his rights.

          Assuming without deciding
that Leach was in custody during his second interview and Miranda
therefore applied, Leach waived his previously-asserted right to counsel when
he initiated the second interview with the sheriff’s office and then
voluntarily waived his right to counsel.  See Cross, 144 S.W.3d at 529. 
Though Leach waived his right to counsel, he asserts that the reason he
confessed was that the deputies told him that he could receive court-appointed
counsel only after they had sufficient evidence to indict him, and he therefore
had no choice but to incriminate himself.  Thus, he contends that his statement
was made involuntarily.  In support of his position, he cites article 38.21 of
the Texas Code of Criminal Procedure and Mason v. State, 116 S.W.3d 248,
260 (Tex. App.—Houston [14th Dist.] 2003, pet. ref’d) (noting that “statement
is involuntary and thus inadmissible, if it is induced by a promise that is (1)
of some benefit to the defendant; (2) positive; (3) made or sanctioned by
someone in authority; and (4) of such a character as would likely influence the
defendant to speak untruthfully”).  Leach further claims that he asked the
detectives whether anything had changed in regard to obtaining a
court-appointed attorney prior to giving his statement.  

Kubricht testified, however, that
Leach indicated that he wished to speak to counsel only during his first visit
to the sheriff’s office.  In addition, Detective Fontenot testified that Leach
never mentioned an attorney on his second trip to the sheriff’s office.  The
videotape of the interview corroborates the detectives’ testimony that they
informed Leach of his right to counsel before he gave his statement, and Leach
voluntarily waived his rights and never requested counsel.  As the sole judge
of the credibility of the witnesses, the trial court could have believed
Kubricht’s and Fontenot’s testimony over Leach’s testimony and thus concluded
that Leach made the statement voluntarily in compliance with article 38.21.  See
Tex. Code Crim. Proc. art.
38.21 (Vernon 2006).  The videotaped interview shows only that Leach
voluntarily waived his right to counsel, and nothing in the record suggests
that he was coerced into doing so.  Mann therefore is not applicable.  Consequently,
we hold that the trial court did not abuse its discretion in denying Leach’s
motion to suppress his statement.[2] 




Motion to Suppress Statement to
Church Elders

Rule of Evidence 505 provides that
“[a] person has a privilege to refuse to disclose and to prevent another from
disclosing a confidential communication by the person to a member of the clergy
in the member’s professional character as spiritual advisor.”  Tex. R. Evid. 505(b).  “A ‘member of
the clergy’ is a minister, priest, rabbi, accredited Christian Science
Practitioner, or other similar functionary of a religious organization or an
individual reasonably believed to be by the person consulting with such
individual.”  Id. 505(a)(1).  “A communication is ‘confidential’ if made
privately and not intended for further disclosure except to other persons
present in furtherance of the purpose of the communication.” Id. 505(a)(2).  The privilege therefore arises when a person makes a communication
with a reasonable expectation of confidentiality to a member of the clergy
acting in his or her professional spiritual capacity.  Nicholson v. Wittig,
832 S.W.2d 681, 685 (Tex. App.—Houston [1st Dist.] 1992, orig. proceeding). 
The Texas rule does not require that the communication be made to a clergy
member who, “under the discipline or [tenets] of his church, denomination, or
organization, has a duty to keep such communications secret.”  Compare Tex. R. Evid. 505, with Gonzalez v.
State, 21 S.W.3d 595, 597 (Tex. App.—Houston [1st Dist.] 2000) (applying the California clergy privilege statute), aff’d,
45 S.W.3d 101 (Tex. Crim. App. 2001).  

During a church service,
Leach stood up and announced to the entire congregation that he was going on a
long journey and did not know where it would end.  Later that day, Leach met
with the clergy elders and confessed that he had committed a murder.  Two days
later after this confession, Leach went to the sheriff’s office and confessed
to Wilson’s murder.  A former elder of Leach’s church testified that the Church of Christ does not have a doctrine that confessions will be kept confidential.  Leach’s
father testified that a member of the congregation can confess to an elder, and
the elder will stand up and tell the congregation what he has confessed, and
they will all pray together.  Leach’s father further stated that no
communication is private unless requested.  One of the elders of the church
testified that Leach never told him that he wanted his communication to be kept
private.  In addition, Leach’s mother and father both testified that Leach
never expressly indicated that he wanted his statements to the clergy to be
kept private.  Leach’s mother also testified that Leach “knew when he told us
what had happened that it was no longer going to be private once it got out.” 
In light of the evidence, the trial court could have disbelieved Leach’s
testimony that he intended the communication to be confidential.  We thus hold
that the trial court did not abuse its discretion.[3] 


Change of Venue

In his third point of error, Leach
asserts that the trial court abused its discretion in denying his motion for
change of venue.  

Standard of review

We review the denial of a motion to
change venue for an abuse of discretion.  Dewberry v. State, 4 S.W.3d
735, 744 (Tex. Crim. App. 1999); see DeBlanc v. State, 799 S.W.2d 701,
705 (Tex. Crim. App. 1990).  We will not reverse a trial court’s ruling on a
motion to change venue if the ruling was within the realm of reasonableness,
given the facts presented to the trial court.  Powell v. State, 898
S.W.2d 821, 826 (Tex. Crim. App. 1994).

Change of Venue

The Texas
Code of Criminal Procedure provides that:

(a) A change
of venue may be granted in any felony or misdemeanor case punishable by
confinement on the written motion of the defendant, supported by his own
affidavit and the affidavit of at least two credible persons, residents of the
county where the prosecution is instituted, for either of the following causes,
the truth and sufficiency of which the court shall determine:

(1) That
there exists in the county where the prosecution is commenced so great a
prejudice against him that he cannot obtain a fair and impartial trial . . . .

 

Tex.
Code Crim. Proc. Ann. art. 31.03(a)(1) (Vernon Supp. 2008).  “A defendant seeking a
change of venue bears a heavy burden to prove the existence of prejudice in the
community and that the likelihood of obtaining a fair and impartial jury is
doubtful.”  Amie v. State, 89 S.W.3d 670, 672 (Tex. App.—Houston [1st Dist.] 2002,
no pet); Powell v. State, 898 S.W.2d 821, 826 (Tex. Crim. App. 1994). 
Further, to satisfy this burden, the appellant must be able to demonstrate an
actual and identifiable prejudice on the part of the members of his jury and
must show that the prejudice has so permeated
the community that perspective jurors’ prejudicial opinions cannot be set aside. 
Amie, 89 S.W.2d at 672; Moore v. State, 935 S.W.2d 124,
129 (Tex. Crim. App. 1996).  

          A change of venue is
required only where pretrial publicity is so “pervasive and prejudicial as to
create a reasonable probability that an impartial jury cannot be impaneled even
with the most careful voir dire.”  Amie, 89 S.W.3d at 672, Narvaiz v.
State, 840 S.W.2d 415, 428 (Tex. Crim. App. 1992).  “The mere fact that a
crime was publicized in the news media does not establish prejudice or require
a change of venue per se.”  Willingham v. State, 897 S.W.2d 351, 357
(Tex. Crim. App. 1995).  Additionally, due process is not violated if jurors
come with some knowledge as to the facts of the case.  Narvaiz, 840
S.W.2d at 428; see also Bell v. State, 938 S.W.2d 35, 46
(Tex. Crim. App. 1996).  When this occurs, due process is satisfied as long as
the venire members provide acceptable assurances that they can try the case
strictly on the evidence.  Amie, 89 S.W.3d at 672; Penry v. State,
903 S.W.2d 715, 728 (Tex. Crim. App. 1995).  

Analysis

Leach sought
a change of venue due to the pretrial publicity his case had received.  He
believed that because he had been touted a “confessed murderer,” he had been
deprived of the presumption of innocence.  In support of his motion, Leach
filed supporting affidavits from Raymond and Don Maimes, and called to the stand
three supporting witnesses: Bo Randall, Raymond Maimes, and Don Maimes.

Although
defense counsel recalled prior conversations with Randall that reflected an
attitude that Leach could not obtain a fair trial in the current venue, Randall
testified that she believed Leach would be able to obtain a fair trial despite
the media attention.  Raymond Maimes, a member of Leach’s church, testified
that he recalled reading newspaper articles labeling Leach as “killer Dan
Leach” and reading reports that stated that Leach had confessed to the crimes. 
Raymond further testified that in his opinion, “the publicity, both on TV and
in the newspapers, [has] presented the news in such a way that they have convicted
[Leach] already.”  Because Don Maimes arrived late to court, and because his
testimony would have been similar to that of Raymond Maimes, the State
stipulated to the contents of his testimony.

          Based upon the record,
Leach did not meet his heavy burden of showing both the existence of actual
prejudice and the inability to obtain a fair trial in the current venue. 
Normal media coverage is to be expected when a crime of this nature occurs, and
jurors do not have to be completely ignorant of the facts of a case so long as
they can try the case solely on the evidence presented.  See Narvaiz,
840 S.W.2d at 428.  Randall, a resident of the area and one of Leach’s own
witnesses, testified that in her opinion, Leach could obtain a fair trial and
that she would be able to decide his guilt or innocence based only upon the
evidence presented.  Further, the evidence presented by Raymond Maimes merely
suggested prejudice in the media but nothing about the community nor did
it suggest that Leach’s ability to receive a fair trial was doubtful.  In
addition, when counsel asked the venire members if they could try the case on
the evidence alone, jurors 20, 23, and 30 stated that they had never heard
about the case.  The remaining impaneled venire members all stated that they
had heard about the case, but would be able to set aside any opinions that they
may have formed.  The venire members who answered that they could not set aside
their preconceived opinions did not serve on the jury.  Because the jurors, as
well as a member of the community, stated that they could be impartial in
deciding Leach’s guilt, the trial court did not abuse its discretion in denying
Leach’s change of venue.

Challenges for Cause

In his fourth point of error, Leach
asserts that the trial court erred in denying his challenges for cause of
jurors who stated that they (1) could not consider the full range of
punishment, including probation, and (2) came to court with pre-conceived
notions detrimental to Leach.  The State responds that Leach has not preserved
error.

Preservation of Error

To preserve error with
respect to a trial court’s denial of a challenge for cause, an appellant must:
(1) assert a clear and specific challenge for cause; (2) use a peremptory
strike on the complained-of venire member; (3) exhaust his peremptory strikes;
(4) request additional peremptory strikes; (5) identify an objectionable juror;
and (6) claim that he would have struck the objectionable juror with a
peremptory strike if he had one to use.  Allen v. State, 108 S.W.3d 281,
282 (Tex. Crim. App. 2003) (citing Nelson v. State, 848 S.W.2d 126, 134
(Tex. Crim. App. 1992), cert. denied, 510 U.S. 830 (1993)).

During voir dire, Leach asked the
venire members if they could consider probation for someone they convicted of
murder.  Leach challenged several jurors for cause based upon their negative
answer to his question, including juror numbers 3, 6, 8, 11, 13, 14, 15, 16,
17, 18, 20, 21, 23, and 30.  Leach also asked the venire members if they had
arrived at court with a preconceived notion that he has one strike against
him.  The jurors that answered affirmatively were juror numbers 6, 12, 13, 14,
17, 21, 29, 34, 37, 38, 40, 43, 46, 47, 48, 56, 57, 66, 69, and 75.  The trial
court granted challenges for cause against juror numbers 2, 9, 10, 12, 34, and
37.  After the trial court denied his challenges for cause against the
remaining jurors, Leach used his peremptory challenges against juror numbers 3,
6, 8, 11, 13, 14, 15, 16, 17, and 18.  Leach therefore presented a clear and
specific challenge for cause and used and exhausted his peremptory strikes
against the complained-of jurors.  Leach thus satisfied the first three parts
of the Allen test.   See Allen, 108 S.W.3d at 282.  

The State misconstrues
this part of the test and asserts that Leach did not preserve error because he
did not peremptorily strike juror numbers 20, 23, and 30.  Leach’s
contention on appeal, however, is not that the trial court erred in denying his
challenges to cause against jurors 20, 23, and 30—the jurors who remained on
the panel.  Rather, Leach asserts that the trial court erred in denying his
challenges for cause to all the jurors who answered that they could not
consider probation.  This included jurors 3, 6, 8, 11, 13, 14, 15, 16, 17, and
18, on whom Leach exercised his peremptory strikes.  Of these, juror numbers 6,
13, and 17 also answered that they had arrived at court with preconceived
notions about Leach’s guilt—the alternative ground on which Leach challenged
them for cause.  When the trial court denied Leach’s challenges for cause of
these jurors, Leach had to use his peremptory strikes to remove them, which
prevented him from using those peremptory strikes on other objectionable jurors,
such as jurors 20, 23, and 30, who sat on the jury.

          Following submission of his
strike list, Leach requested ten additional peremptory strikes, which the trial
court denied.  The State contends that Leach’s request for additional strikes
was untimely.[4]  We agree.  Leach should
have requested additional strikes and identified objectionable jurors prior to
submission of each side’s strike lists at which point
“the trial court could have examined appellant’s strike list, reconsidered
denial of the challenge for cause, and granted the request for another
peremptory strike.”  McBean v. State 167 S.W.3d 334, 339 (Tex. App.—Amarillo 2004, no pet.) (holding that appellant did not preserve error on challenge
for cause issue because he failed to timely (1) advise the trial court that he
had actually used a peremptory challenge to strike objectionable juror and had
used all his other peremptory challenges, (2) request an additional peremptory challenge and
(3) identify a specific objectionable juror that he would strike if given an
additional peremptory challenge because he made these requests after the
parties’ peremptory strikes had been used and the jury members disclosed); cf.
Tillman v. State, No. 14-98-01233-CR, 2001 WL 543666 at *1–4 (Tex. App.—Houston
[14th Dist.] May 24, 2001, pet. ref’d) (not designated for publication)
(holding that appellant preserved error even though he did not request
additional peremptory strikes until after jury was seated because appellant
told trial court that he was going to request additional peremptory strikes
after jury had been announced but prior to them being sworn in, trial court
accepted this manner, and state did not object).  Because Leach failed to
preserve error, we do not consider the merits of this issue.




Conclusion

          We hold that the trial
court did not err in denying Leach’s motions to suppress, his motion for change
of venue, or his challenges for cause during voir dire.  We therefore affirm
the judgment of the trial court.

 

 

 

                                                                   Jane Bland

                                                                   Justice

          

Panel consists of Chief Justice
Radack and Justices Jennings and Bland.

Do not publish.  Tex. R. App. P. 47.4.

 

 









[1]           Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966).  This federal case is frequently invoked, as it is here,
as a shorthand reference to its Texas counterpart, which contains additional
safeguards and is codified in the Texas Code of Criminal Procedure.   Tex. Code Crim. Proc. Ann. art. 38.22
(Vernon 2005).





[2]              Leach
also asks that we extend Miranda “for persons like Appellant who desire
to make an incriminating statement to the police to make such decision
intelligently and knowingly.”  Here, however, the record clearly shows that
although Leach was not in custody when he twice went to the Fort Bend Sheriff’s
Office, the deputies advised him of his legal rights on both occasions.





[3]               We note that even if the trial court did
abuse its discretion, it was harmless error because Leach went to the sheriff’s
office on his own initiative two days after speaking with the elders and
confessed to the murder in much greater detail than what he had told the
elders.  See In re E.C.D., No. 04-05-00391-CV, 2007 WL 516137 at *3 (Tex. App.—San Antonio Feb. 21, 2007, no pet. h.) (mem. op.) (finding that appellant failed
to show that he was harmed by the admission of testimony because he had made
similar statements to four other witnesses); see also Martinez v. State,
No. 13-01-379-CR, 2002 WL 1860301 at *1 n.7 (Tex. App.—Corpus Christi Aug. 15,
2002, no pet.) (not designated for publication) (noting that admission of
appellant’s statements to clergyman was harmless because “significantly more
inculpatory evidence was received by way of the admission of appellant’s
written confession which was far more detailed”). 

 





[4]
              As support, the State cites Contreras
v. State, 56 S.W.3d 274, 277–78 (Tex. App.—Houston [14th Dist.] 2001, pet.
ref’d).  Contreras, however, held that because the parties and the trial
court had agreed that challenges for cause were to be made when they became
apparent, the trial court did not err in refusing to consider appellant’s
challenges for cause that were made at the conclusion of voir dire.  In this
case, the State is contending that Leach did not timely request additional
peremptory strikes, not that Leach untimely challenged the jurors for cause.